UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 06-21076-CIV-HUCK/SIMONTON

L'ARBALETE, INC.,

    Plaintiff,
vs.

LOURDES ZACZAC, *et al.*,

    Defendants.
_____/

## CORRECTED FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]
### INTRODUCTION

    This action came before the Court for a non-jury trial on January 8th and 9th, 2007. The Court heard the testimony of twelve witnesses, reviewed the exhibits admitted into evidence, considered the parties' Joint Pretrial Stipulation and Supplemental Joint Pretrial Stipulation. This is an action for payment on a promissory note (the "Note"). Defendants, Lourdes Zaczac and Georgi Zaczac, acknowledge the existence of the Note and its non-payment. Defendants, however, raise the affirmative defenses of usury, illegality and lack of consideration. At trial, the Zaczacs acknowledged that all of their defenses were based on, and subsumed in, the defense of usury. Their usury defense, in turn, involves five separate issues: 1) whether the Zaczacs have standing to assert a usury defense; 2) whether Florida or Delaware usury law applies; 3) if Florida law applies, whether the initial transaction giving rise to the subject Note, was violative of Florida's usury laws, that is, was it a loan as opposed to an investment; 4) if so, whether the subsequent Note purged the usurious taint of the initial transaction; and 5) if not, whether the lender acted with the corrupt intent contemplated by Florida's usury statute? Having considered the evidence and being otherwise fully advised in the premises, the Court hereby enters the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P 52.

### FINDINGS OF FACT

    1.    Plaintiff L'Arbalete, Inc. ("L'Arbalete") is a Panamanian corporation. The Court has

---

[1]These Corrected Findings of Fact and Conclusions of Law reflect corrections to typographical errors in the original Findings of Fact and Conclusions of Law.

previously determined that, as of the date this action was filed, L'Arbalete's principal place of business was not in Florida. Non-party Inversiones Charpari, is a Costa Rican company.

2. Defendants Georgi and Lourdes Zaczac (the "Zaczacs") are residents of Florida and the owners of commercial (hotel and retail) businesses in Orlando and Miami, Florida, including the Sheraton Miami International Merchandise Mart (the "Mart").

3. The Note sued upon here was signed and delivered to L'Arbalete by the Zaczacs in Miami on April 1, 2005 in connection with the refinancing of the Zaczacs' companies' commercial properties in Miami. The Note represented the remaining balance of a total of $8,301,852.25 payable to L'Arbalete and Inversiones Charpari, pursuant to a July 2, 2003 Transaction. It is the July 2, 2003 Transaction which dominates this litigation.

### The 2003 Transaction Among SFH II (Del), LLC, L'Arbalete and Inversiones Charpari

4. The Zaczacs' contend that the Note was usurious because it arose out of a July 2, 2003 usurious transaction among L'Arbalete, Inversiones Charpari and SFH II (Del), LLC, a Delaware limited liability company ("LLC") formed by Mr. Zaczac's counsel for purposes of facilitating the July 2, 2003 Transaction.

### The 2003 Transaction

5. Georgi Zaczac is President of South Florida Hotels, Inc. ("South Florida Hotels"), an entity that owns and operates the Mart. On or about May 23, 2003, South Florida Hotels' sole shareholder was SFH I, LLC, a Florida limited liability company. SFH I, LLC's sole member was SFH II, LLC. SFH II, LLC's members were Georgi and Lourdes Zaczac, and Florida Hotels & Restaurants, Inc., a company controlled by the Zaczacs.

6. In 2003, the Zaczacs' business enterprise owed more than $1 million in overdue federal withholding taxes; more than $400,000 in sales taxes to the Florida Department of Revenue; approximately $200,000 to Radisson Hotels Worldwide, the then licensor for the Mart hotel. In addition, the company's first mortgagee (J.P.Morgan) had declared a default on the mortgage on the Mart property, which had an outstanding balance of approximately $31.5 million on June 27, 2003. Because of its precarious financial condition, in large part brought about by the general decline in hotel business resulting from the events of September 11, 2001, SFH II, LLC sought an infusion of capital. The Zaczac's efforts to secure capital, which included an investment proposed to Mr. Zaczac by his son, were initially unsuccessful.

7.      As Mr. Zaczac continued to seek capital, Mr. Zaczac's attorney, Juan Loumiet of Greenberg Traurig, proposed converting the Mart, which was then comprised of leased shops, into a retail condominium wherein the tenants (or other potential purchasers) could purchase the shops in the Mart. To Mr. Loumiet's knowledge, such a retail condominium conversion project had not been attempted before. Through Mr. Loumiet, Mr. Zaczac approached Pedro Arbulu and Ernesto Schutz about investing in the Mart. Mr. Arbulu was related to Mr. Loumiet (his wife was Mr. Loumiet's wife's sister) and Mr. Zaczac knew of this relationship. .

8.      In order for the conversion to occur, Mr. Zaczac needed time and funds to satisfy other creditors while the condo conversion plan was implemented. Messrs. Arbulu and Schutz were asked to consider investing in the Mart and the Mart condo conversion project. After some initial negotiations, Mr. Loumiet prepared a "Term Sheet for Proposed Investment" which set forth the basic terms of a proposed investment by a group directed by Messrs. Schutz and Arbulu in the Mart project. The Term Sheet called for the formation by Messrs. Schutz and Arbulu of an investment company that would invest $4.5 million in a new limited liability company that was to be domesticated in Delaware. Messrs. Schutz and Arbulu's newly formed investment company would become a member of the newly formed Delaware LLC and own a preferred membership interest redeemable at a priority return of 40%, with priority as to all distributions over the membership interests of the other beneficial owners (the Zaczacs and Florida Hotels & Restaurants). The $4.5 million investment was to be earmarked for specified purposes including payment of tax liabilies and bringing the J.P. Morgan loan current. In the event that the Delaware LLC failed to redeem the preferred membership interest, the sole remedy for the preferred member would be the right to assume managerial control of the Delaware LLC without extinguishing the rights of the other LLC members (the Zaczacs and their company Florida Hotels and Restaurants, Inc.).

9.      The Zaczacs' counsel in the 2003 Transaction had determined prior to May 21, 2003 that a Delaware LLC should be used for purposes of the transaction because Delaware's statutes concerning limited liability companies were commonly used for venture capital transactions and complicated business arrangements such as those involved here. Mr. Loumiet also believed that Delaware law was more likely to honor the intent of the parties to the transaction. The initial version of the Term Sheet contemplated a single equity investment in the to be created Delaware LLC.

10. After the Term Sheet was negotiated and executed, Messrs. Schutz and Arbulu retained James Barrett of the law firm Baker & McKenzie to represent them in connection with the proposed transaction. Following his review of the Term Sheet, Mr. Barrett agreed that a Delaware LLC should be formed to participate in the proposed transaction. Mr. Barrett felt that Delaware's law concerning limited liability companies provided greater flexibility in terms of applicable duties of care and greater rights for LLC members in terms of confidentiality and liquidation provisions. According to Mr. Barrett, use of Delaware LLC's in transactions involving Florida real estate is routine, and often preferable. Attorneys for both sides were aware of Delaware's usury laws which were more favorable to corporate lenders than Florida's laws.

11. Consistent with the proposal in the Term Sheet, a certificate of formation was filed with the State of Delaware Secretary of State, Division of Corporations on June 11, 2003, creating SFH II (Del), LLC. On June 16, 2003, a Certificate of Merger was filed with the Delaware Secretary of State merging SFH II LLC, the Florida LLC, into the newly created SFH II (Del), LLC. Mr. Zaczac signed the certificate of merger on behalf of his company.

12. Upon further consideration of the proposed terms, Mr. Barrett, in consultation with his tax experts, proposed splitting the proposed investment into two components – a debt component and an equity component – for tax purposes. L'Arbalete would advance $3.5 million to SFH II (Del) in exchange for a promissory note bearing an interest rate of 18%, while Mr. Arbulu's company, Inversiones Charpari, would advance $1 million to SFH II (Del) in exchange for a "special member interest" in SFH II LLC. Together the combined rate of return on the total amount of $4.5 million was to be the same as originally contemplated – 40% per year.

13. Splitting the investment into separate debt and equity components was beneficial to both sides. This arrangement would allow SFH II (Del) to deduct the interest payments on its promissory note to L'Arbalete for income tax purposes, and allow L'Arbalete to avail itself of the foreign portfolio debt provision set forth in 26 U.S.C. § 881(c). Under that provision, a foreign corporation is shielded from tax on interest it receives in connection with "portfolio debt." Structuring the transaction so as to take advantage of the foregoing provision would allow L'Arbalete to avoid taxes altogether on the interest it received on its $3.5 million note. The investors would pay less in capital gains taxes on account of the redemption of less equity. The parties agreed that a maximum

reasonable loan amount, to pass the Internal Revenue Service's review, was $3.5 million.

14.     Accordingly, the parties proceeded under the part-debt, part-equity structure proposed by Mr. Barrett. The deal was closed on July 2, 2003. L'Arbalete accepted a $3.5 million note (entitled Credit Facility Agreement) from SFH II (Del) bearing 18% and Inversiones Charpari contributed $1 million dollars to SFH II (Del) in exchange for a special member interest in the LLC.

15.     The special member interest issued to Inversiones Charpari was to be redeemed by SFH II (Del) in two years at a capped preferred return of 117%. It is undisputed that the 18% return on the debt to L'Arbalete and the preferred 117% return on Inversiones Charpari's special member interest were interrelated and calculated to provide the investors a potential combined return of 40% on their advance to SFH II. However, internally between L'Arbalete and Inversiones Charpari, they had agreed that regardless of the ratio of the loan to the special member interest reflected in the paperwork, they would continue to treat their respective investments as originally contemplated and as reflected in their respective contributions, that is one-third to Inversiones Charpari and two-thirds to L'Arbalete.

16.     No collateral of any type was to secure SFH II (Del)'s payment on the $3.5 million note to L'Arbalete or its redemption of Inverrsiones Charpari's special member interest. Furthermore, the note to L'Arbalete contained an eight-year forbearance period providing that in the event of non-payment at the conclusion of a two year payment period, L'Arbalete could not exercise any rights or remedies for a period of eight years from the date of execution of the note.

17.     If SFH II (Del) failed to redeem Inversiones Charpari's member interest, Inversiones Charpari had the right to assume management of the LLC. Mr. Barrett explained that if Inversiones Charpari were required to exercise its limited control right, it would be required to act in a fiduciary capacity towards the other LLC members, whereas a creditor taking "control" would not.

18.     Inversiones Charpari was also provided with the right to (i) review books and records; (ii) participate in major decisions regarding the company; (iii) exercise nine (9) percent voting rights; (iv) have an accountant inspect the records of the company at the company's expense; and (v) in the event that their interest was not redeemed, assume management control, without extinguishing the Defendants' interest in the company. In the event of liquidation, Inversiones Charpari would be limited to recouping its special member interest, but only after all creditors collected on their debts.

19. The Zaczacs were not parties to any of the 2003 Transaction documents, gave no personal guarantees and only signed documents in their representative capacities.

20. After consummating this transaction in July 2003, funds were forwarded to SFH (Del) II in Miami, Florida, and Mr. Zaczac refinanced his J.P. Morgan loan with Suntrust on December 26, 2003.

### The 2005 Refinancing

21. In Spring of 2005, Mr. Zaczac sought to refinance the Mart's mortgage, this time through Wachovia Bank, N.A.. At that time, Mr. Zaczac requested that L'Arbalete and Inversiones Charpari agree to accept $7 million to: (1) completely redeem and eliminate Inversiones Charpari's $1 million special member interest in SFH II (Del); (2) pay all interest due to L'Arbalete under the $3.5 million July 2, 2003 promissory note; and (3) pay a portion of the outstanding principal due to L'Arbalete on that note, leaving a substantial balance due.

22. The parties agreed that the remaining principal on the Note to L'Arbalete would not be paid by SFH II (Del). Instead, Mr. and Mrs. Zaczac agreed that they would execute a personal promissory note for $1,301,852.25, the amount that SFH II (Del), LLC still owed L'Arbalete. This is the Note at issue. In exchange for the Note, L'Arbalete agreed that SFH II (Del) had no further responsibility under the 2003 promissory note.

23. As a result of the March 31, 2005 refinancing, SFH II (Del), LLC was released of any liability to either L'Arbalete or Inversiones Charpari.

24. The Zaczacs now allege that the Note is usurious because it arose out of and was a continuation of the July 2, 2003 Transaction, which they allege created a loan obligation subject to an unlawful rate of interest pursuant to Florida's usury laws.

25. The amount due on the Note as of January 29, 2007 is $1,301,852.25 in principal and $594,450.78 in accrued interest, for a total of $1,896,303.03.

### CONCLUSIONS OF LAW

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) as the Zaczacs are residents of Florida while L'Arbalete, a Panama corporation, does not have its principle place of business in Florida. The sum in controversy exceeds $75,000.00.

As indicated above, the Zaczacs defends this action to collect on the Note solely on the basis that the Note is usurious under Florida's usury statutes. In order to prevail on their usury defense, the Zaczacs

must prevail on all five of the issues enumerated in the Introduction. In other words, the Zaczacs must show that: 1) they have standing to assert a usury defense; 2) Florida law applies to the 2003 Transaction; 3) the 2003 Transaction was a loan, not an investment; 4) the Note did not purge the usurious taint of the 2003 Transaction; and 5) the lenders acted with corrupt intent.

Because the Court concludes that Delaware law applies to the 2003 Transaction, and that, even if Florida law applied to the 2003 Transaction, the special member interest aspect was an investment, not a loan, and, therefore, not subject to Florida's usury law, the Court need not resolve all of the remaining issues. Therefore, for purposes of this order, the Court assumes, without deciding, that the Zaczacs have standing to assert their usury defense.

### Delaware Law Applies To The 2003 Transaction

Under Delaware law, the 2003 Transaction would not be usurious for two reasons. First, under Delaware law there is no limit on interest that may be charged for a loan that exceeds $100,000. 6 Del Cod Ann. § 2301(c).[2] Second, Delaware prohibits a corporation from asserting the defense of usury. 6 Del Code Ann. § 2306. Thus, if Delaware law applies to the 2003 Transaction, it is not usurious. Therefore, the Court must first determine which law applies.

In resolving this choice of law question, the Court starts with Florida's choice of law rules which govern analysis of this issue. *Klaxon Co. V. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *Shaps v. Provident Life & Accident Ins. Co.*, 244 F.3d 876, 881 (11th Cir. 2001). In Florida, issues such as contract validity, execution, or interpretation are substantive issues for choice of law purposes. *In re Estate of Joise Joaquin Nicole Santos v. Nicle-Sauri*, 648 So.2d 277, 280 (Fla. 4th 1995) (citing *Scudder v. Union Nat'l Bank*, 91 U.S. 406, 411 (1875)); *see also In re Ocean Transp. Corp.*, 213 B.R. 383 (Bankr. N.D. Fla. 1997). The question of which state's substantive law applies in a case is a question of law. *Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1118 (11th Cir. 1990); *Liberty Mutual Ins. Co., v. Electronic Sys., Inc.*, 813 F. Supp. 802, 804 (S.D. Fla. 1993)(holding that Court must decide applicable law).

---

[2] 6 Del. Code § 2301(c) (2006) provides that "there shall be no limitation on the rate of interest which may be legally charged for the loan or use of money, where the amount of money loaned or used exceeds $100,000 and where the repayment thereof is not secured by a mortgage against the principal residence of any borrower."

"Florida courts will generally enforce choice-of-law provisions 'unless the law of the chosen forum contravenes strong public policy.'" *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So.2d 306, 311 (Fla. 2000) (footnote omitted) (citing *Punzi v. Shaker Adver. Agency, Inc.*, 601 So.2d 599 (Fla. 2d DCA 1992)). This rule is premised on the presumption that choice-of-law provisions are valid unless the party seeking to avoid enforcement of them sufficiently carries the burden of showing that the foreign law contravenes strong public policy of the forum jurisdiction. *Id*. "The term 'strong public policy' means that the public policy must be sufficiently important that it outweighs the policy protecting freedom of contract." *Walls v. Quick & Reilly, Inc.*, 824 So.2d 1016 (Fla. 5th DCA 2002)(citations omitted). A choice of law provision in a contract "is presumed valid until it is proved invalid; the party who seeks to prove such a provision invalid bears the burden of proof." *Acosta v. Campbell*, 2006 WL 146208 (M.D. Fla. Jan. 18, 2006)(citing *Mazzoni Farms*, 761 So.2d at 311); *Delhomme Indus., Inc. v. Houston Beechcraft, Inc.*, 669 F.2d 1049, 1058 (5th Cir. 1982). Moreover, Florida, as have most states, has developed special criteria for resolving choice-of-law in the usury context. *See Continental Mortgage Investors v. Sailboat Key, Inc.*, 395 So.2d 507, 510 (Fla. 1981).

"Florida's usury statute prohibiting certain interest rates does not establish a strong public policy against two parties' contractually agreeing to apply another state's law, under which the agreement was valid." *Burroughs Corp. v. Suntogs of Miami, Inc.*, 472 So.2d 1166, 1167 (Fla. 1985). Thus, Florida courts will enforce a choice of law agreement even if it is expressly designed to evade Florida's usury laws. *Morgan Walton Properties, Inc. v. International City Bank & Trust Co.*, 404 So.2d 1059 (Fla. 1981). In *Continental Mortgage*, the Florida Supreme Court explained that there is no public policy support for enforcing Florida's usury laws when the parties selected the law of a jurisdiction whose laws would uphold the agreement:

> Finding no real support in our case law for the public policy exception under these circumstances, and in view of the pervasive exceptions to the usury laws and the actual operation of these laws, we are unable, particularly in the commercial setting of this case, to glean any overriding public policy against usury qua usury in a choice of law situation.
> 395 So.2d at 510.

The Florida Supreme Court did however, place limitations upon enforcement of the contracting parties expressed intention to select the laws of the state with the more favorable usury laws (from the lender's prospective). In doing so it explained that the historical "good faith" qualification on such a

selection, should not be taken too literally:

> The effect of the [of good faith] qualification is merely to prevent the evasion or avoidance at will of the usury law otherwise applicable, by the parties' entering into the contract or stipulating for its performance at a place which has no normal relation to the transaction and to whose law they would not otherwise be subject. *Id.* at 511.

The Florida Supreme Court noted that the historical rationale underlying the choice of law rule was the parties' "presumed intention," that is, they had presumed to have agreed to the law of the state where the transaction would be deemed valid. The Florida Supreme Court went on to note that more recently this historical rationale has been modified because parties frequently include express choice of law provisions in their commercial, multi-state contracts. Today, the focus is not on the commercial parties' presumed intent, but rather on their known, justified expectations as expressly set forth in their agreements. Thus, the Florida Supreme Court held that:

> A prime objective of both choice of law . . . and of contract law is to protect the justified expectations of the parties. Subject only to rare exceptions, the parties will expect on entering a contract that the provisions of the contract will be binding upon them . . .. Usury is a field where this policy of validation is particularly apparent . . .. (T)he courts deem it more important to sustain the validity of a contract, and thus to protect the expectations of the parties, than to apply the usury law of any particular state.
>
> Restatement (Second) of Conflict of Laws, § 203, Comment b (1971). Thus, the rule of validation is generally viewed as the best means of furthering the parties' expectations. A final justification for the traditional rule is founded in the idea of commercial comity. Since practically every jurisdiction that has confronted this issue has adopted some form of the traditional rule, this state would be commercially singular if it did not apply favorable law of the state with a normal relation to a contract. Commercial stability in interstate trade depends on predictability and some degree of uniformity among the states in their willingness to honor commercial agreements. *Id.*

However, the Florida Supreme Court, while acknowledging the primacy of the contracting parties' choice of a particular state's usury law, recognized that that choice was not without limitations. The limitation being that the selected state have "a normal relation to the transaction". In the words of the Florida Supreme Court it

> . . . will follow . . . the traditional rule, which upholds an agreement against usury by applying foreign law if the foreign jurisdiction has a normal relation to the transaction and would also favor the agreement. To this we add the clarification offered by [*Seeman v. Philadelphia Warehouse Co.*, 274 U.S. 403 (1927)] that good faith of the parties is not

relevant to a choice of laws question in the usury area unless no substantial or normal relation exists between the foreign jurisdiction and the transaction. *Id.* at 513.

Applying this standard to the present case, the Court concludes that the parties have expressly selected the laws of a state, Delaware, which had a normal relation to, and would favor, the 2003 Transaction. In so concluding, the Court finds that Mr. Zaczac initially proposed utilizing a Delaware LLC as the investment vehicle. More important, both parties had a valid, reasonable basis for utilizing a Delaware LLC and selecting Delaware law. As indicated above, the selection of a Delaware LLC, initiated by the Zaczacs' attorney, was based on Delaware's more flexible, more predictable corporate law. This opinion was thereafter validated by L'Arbelete's legal counsel whose unchallenged testimony established that, because of the nature and complexity of the 2003 Transaction, using a Delaware LLC and applying Delaware law was preferable to using a Florida LLC and Florida law for a variety of significant reasons. According to the unrefuted testimony, Delaware LLCs and Delaware law were commonly used in venture capital and complex transactions, such as the 2003 Transaction, because Delaware law better provides for meeting both parties' goals. Delaware corporate laws, applied to a Delaware LLC as compared to Florida laws, applied to a Florida LLC, offer greater flexibility and freedom of contract, are easier to comprehend and apply, are more predictable, have favorable, established standards for liquidation and windup of corporate affairs, including duty of care, fiduciary duty and loyalty owed to other owners. These latter aspects of Delaware law were of particular importance because the rather complex structure of the transaction, initially structured as a single $4.5 million investment, and the very precarious financial condition of the Zaczacs' business enterprise. While there is evidence that both sides were aware of, and considered, the more favorable usury laws, this was but one consideration in choosing a Delaware LLC and Delaware laws.

In this case, once the parties had resolved that it was in their best interests to utilize a Delaware LLC in a complex commercial transaction which would be better governed by Delaware law, Delaware had a "normal relation" to that transaction. It is generally accepted that the place of one parties' residence or incorporation may provide the normal relation to a transaction as contemplated in a choice of usury laws context, or at least is a compelling factor in that determination. *See Continental Mortgage*, 395 So.2d at 513, *Cienna Corp. v. Jarrad*, 203 F.3d 312, 324 (4th Cir. 2000); *Preferred Capital, Inc. v. Associates in Urology*, 453 F.3d 718 (6th Cir. 2006); *Valley Juice Ltd. v. Evian Waters of France, Inc.*, 87 F.3d 604, 608 (2d Cir. 1996); *see also Land-Cellular Corp. v. Zokaitis*, 2006 WL 3040766 * 12 (S.D. Fla. Oct. 23,

2006); *Carlock v. Pillsbury Co.*, 719 F. Supp. 791, 807 (D. Minn. 1989); *Hale v. Co-Mar Offshore Corp.*, 588 F. Supp. 1212, 125 (W.D. La. 1984); *Nedlloyd Lines, B.V. v. San Mateo County*, 3 Cal. 4th 459, 467 (Cal. 1992); Restatement (Second) of Conflicts § 187(2)(a) comments f and g (explaining that a choice of law clause selecting the law of the state of one of the parties is demonstrably reasonable and substantial relationship test met "where one of the parties is domiciled in the chosen state").

Because SFH II (Del), II, the entity in which the investment was made, is a Delaware entity, Defendants have not met their burden of demonstrating that a "normal relation" to Delaware is lacking.

In summary, the Court concludes that the parties clearly expressed their justified expectation and intention to make applicable the laws of Delaware, a state with a normal relation to the 2003 Transaction. Therefore, the Zaczacs have not carried the burden of their usury defense.

### Inversiones Charpari's Special Member Interest Is Not A Loan

Even though the Court has determined that Delaware law applies, the Court will next determine, assuming for argument's sake only that Florida law applies, whether the 2003 Transaction was usurious under Florida law. Stated simply, the issue is whether the special member interest was a loan or an investment.

As part of the 2003 Transaction, Inversiones Charpari acquired a special member interest in SFH II (Del), LLC. It is without dispute that this special member interest, together with the $3.5 million loan, was to provide Inversiones Charpari and L'Arbalete a 40% total return on their $4.5 million advanced funds, as originally contemplated in the Term Sheet. The Zaczacs contend that this special member interest was a mere subterfuge, that the whole 2003 Transaction was a loan. In making that contention, the Zaczacs correctly point out that in determining whether the transaction is usurious the Court must look at the substance of the transaction, not the form or designation given to it by the parties.

Section 687.02(1), Florida Statutes, provides that "[a]ll contracts for the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt at a higher rate of interest [than provided by law] are hereby declared usurious." Section 687.02(1) cross references § 687.071 which provides that: "If such loan, advance of money, line of credit, forbearance to enforce the collection of debt or obligation exceeds $500,000 in amount or value, then no contract to pay interest thereon is usurious unless the rate of interest exceeds the rate prescribed in s. 687.071." Section

687.071(7) provides that no "extension of credit" charging interest and payments in excess of 25% simple interest per annum "shall be an enforceable debt in the courts of this state."

Florida's usury statutes apply to "a rate of interest" charged against any loan or identified advance of money.  Fla. Stat. § 687.03(1).  However, Section 687.04 provides that the interest on loans or advances of money greater than $500,000.00, shall not, for purposes of determining usury, apply to any return on any advance of money "the value of which substantially depends on the success of the venture in which are used the proceeds of that loan [or] advance of money."  Earnings on an advance of money that is placed at speculative risk are typically not subject to Florida's usury statutes.  *Diversified Enterprises, Inc. v. West*, 141 So.2d 27, 31 (Fla. 2d DCA 1962).  Generally speaking, equity investments involve speculative risk, while loans involve less risk as reflected in their lower returns.  *See In re Lane*, 742 F.2d 1311, 1314 (11th Cir. 1984)("Generally, shareholders place their money 'at the risk of the business' while lenders seek a more reliable return.")

Consistent with the Florida's usury statutes, courts require the existence of a "loan," either express or implied, to uphold a charge of usury.  *See Pinchuck v. Canzoneri*, 920 So.2d 713, 715 (Fla. 4th DCA, 2006) ("The . . . requirements of a usurious transaction are: 1) that such transaction must be a loan, expressed or implied.")  As indicated above, the description given the transaction by the parties is not determinative, rather it is reality that controls.  Thus, for Florida's usury statute to apply to the 2003 Transaction, Defendants must establish that the funds which Inversiones Charpari advanced were not placed at its substantial risk.  *See Oregrund*, 873 So.2d at 453 (explaining that if "appellees were primarily investors, not lenders," the usury statute does not apply); *Beausejour Corp., N.V. v. Offshore Development Co., Inc.*, 802 F.2d 1319, 1322 (11th Cir. 1986) ("Florida precedent and the case law on which the Florida precedent was based establishes that there must be a substantial risk, i.e., a chance of losing one's whole investment, in order for a financing transaction to be exempted from the usury statute").  Moreover, where a financial arrangement transferring funds is capable of more than one construction, courts presume a lawful purpose.  *Diversified Enterprises*, 141 So.2d at 30.

Thus, the question of whether Inversiones Charpari's special member interest falls within the scope of "any other obligation whatsoever" or an "extension of credit" as contemplated by § 687.02(1) and § 687.071(7) is answered in the negative.  In considering the substance of the 2003 Transaction, including the special member interest, the Court concludes that it does not run afoul of Florida's usury statutes.

Here, the $1 million advance to SFH II (Del), LLC for the special member interest was clearly at substantial risk. The special member interest provided Inversiones Charpari with nine percent (9%) voting rights in SFH (Del) II, and limited operational oversight. While Inversiones Charpari was entitled to a priority return on its investment over other owners, that investment was not secured by a mortgage, personal guarantee, security interest, pledge of stock, assignment of rents, right to appoint a receiver or anything else typically given to secure a lender. While Inversiones Charpari's $1 million investment procured for its voting rights and some management oversight, it did not procure a claim on any of the underlying assets of SFH II (Del) or of the Defendants. To the contrary, the agreement stated: "In no event shall the Voting Rights of the Special Member imply, or be construed as creating any claim by the Special Member, that is has any distribution right or other economic participation right in the company other than those distribution rights expressly granted to the special member under this Agreement." Those "Distribution rights" required the special member interest to be paid only from net cash flow, consistent with an investment and similar to preferred stock. *See Bailey v. Harrington*, 462 So.2d 86 (Fla. 3d DCA 1985)(advance of funds was not a loan where "it was not payable at all if no profits were realized from the project"); *Schwab v. Quitoni*, 362 So.2d 297 (Fla. 3d DCA 1978)(same).

If SFH II (Del) defaulted in its promise to reacquire the special member interest at the end of two years, Charpari had the right to appoint new management to proceed with the "Project Plan," or in new management's discretion, to liquidate the business enterprise. If liquidation were pursued, whatever Inversiones Charpari would receive would depend entirely on what was left in the business, if anything, after all creditors were satisfied. Moreoever, in such liquidation, Inversiones Charpari, unlike a lender, would have significant limiting fiduciary duties owed to the other owners.

The 2003 Transaction is somewhat analogous to that in *Hurley v. Slingerland*, 461 So. 2d 282 (Fla. 4th DCA 1985). There, Slingerland became a limited partner after advancing the partnership $220,000. The partnership executed a promissory note for the $220,000 and the general partners guaranteed 62.5% of the note. *Id*. When the partnership defaulted Slingerland sued on the note. The general partners asserted usury as a defense to non-payment. The Fourth DCA rejected that defense. The court held: "[T]he general partners guaranteed only 62.5% of the face amount of the note. Since a portion of appellee's investment was at risk, we hold the transaction was not usurious." *Id*. at 284; *see also Diversified Enterprises*, 141 So. 2d at 31 ("The option represented a speculative risk. The financial

arrangement here must be looked to as a whole. . . [C]onsequently, the transaction falls outside the ambit of the usury law"). When viewed as a whole, and considering the economic realities of the Zaczacs' business enterprise in 2003, the 2003 Transaction, and specifically the $1 million given for the special member interest, represented a very speculative risk, the kind associated with an equity investment and corresponding high returns.

While it is true that the substance of the transaction controls over the form or label given to it by the parties, the Court notes that from the very inception of this transaction through the 2005 refinancing, all parties, and their numerous attorneys, considered and intended that the advance of funds for the special member interest was an equity investment. Indeed, until both sides realized that they could obtain significant tax benefits by bifurcating the transaction as they ultimately did, it was clearly contemplated that the whole $4.5 million was an equity investment. The Term Sheet for Proposed Investment consistently refers to the advance of funds as an "investment" in the Zaczac's business enterprise. The Term Sheet categorically states that "the Investor Group proposes to invest $4.5 million (the 'Investment') and will become a member of SFH II . . . owning a preferred membership interest which will have priority as to all distributions over the membership interest of the Beneficial Owners." The Term Sheet includes sections entitled "Investment Amount", "Structure of Investment", "Return of Investment", "Use of Investment", "Investment Group", "Investment Company", as well as the term "minimum preferred return." It appears that the parties' intent was successfully implemented in the 2003 Transaction, at least as to the special member interest portion. Indeed, SFH II (Del) characterized Inversiones Charpari's investment as additional paid-in capital – not debt – on its 2003 federal tax return.[3]

In the income tax context, the former Fifth Circuit Court of Appeals has identified thirteen useful guidelines that may be applicable for resolving a "debt versus equity" controversy: 1) the names given to the certificates evidencing the indebtedness; 2) the presence or absence of a fixed maturity date; 3) the source of payments; 4) the right to enforce payment of principal interest; 5) participation in management flowing as a result; 6) the status of the contribution in relation to regular corporate creditors; 7) the intent of the parties; 8) "thin" or adequate capitalization; 9) identity of interest between creditor and stockholder; 10) source of interest payments; 11) the ability of the corporation to obtain loans from outside lending

---

[3] In its 2004 tax return, SFH II (Del) re-characterized the investment as debt. However, no explanation was offered for this re-characterization one year after the transaction.

-14-

institutions; 12) the extent to which the advance was used to acquire capital assets; and 13) the failure of the debtor to repay on the due date or seek a postponement. *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972). While these guidelines are not controlling state law, and some are inapplicable to the facts presented here, several offer meaningful support for the Court's conclusion that Inversiones Charpari's $1 million was an equity investment. In particular, factors (1), (2), (3), (5), (6), (7), (8), (10), (11), (12) and (13) lend such support. Thus, even if Florida usury laws applied, the Zaczacs have failed to satisfy their burden of establishing that the 2003 Transaction was usurious.

### If the 2003 Transaction Were Usurious, That Usury Would Taint the Note

As an additional argument against the Zaczac's usury defense, L'Arbalete contends that even if the 2003 Transaction were usurious, the Zaczacs and SFH (Del) II abandoned any right to now assert usury arising from the 2003 Transaction by virtue of the cancellation of the 2003 promissory note and special member interest together with the issuance and acceptance of the Note in 2005 as final payment of the promissory note. In making this contention that the Zaczacs have abandoned any usury claim by their subsequent agreement, L'Arbalete relies primarily on *Gunn Plumbing, Inc. v. Dania Bank*, 252 So.2d 1 (Fla. 1971) and *Munilla v. Perez-Cobo*, 335 So.2d 584 (Fla. 3d DCA 1976). The facts and holdings in these cases are materially different from those presented here and do not support L'Arbalete's contention. In *Gunn* the defendant-borrower specifically stipulated to a waiver of its usury defense in a first lawsuit brought by the plaintiff-lendor to collect on the alleged usurious note. In settlement of the lawsuit, the parties cancelled the existing usurious note, entered into a new note and lender dismissed the lawsuit. Borrower defaulted on the new note when the lender filed a lawsuit on the defaulted new note the borrower asserted usury as to the new note. The borrower argued that the usurious nature of a transaction is determined at its inception and cannot be cured by a subsequent transaction. The borrower relied on the principle that a new note may be tainted by the usurious nature of a prior cancelled note. The Supreme Court, acknowledging that long standing principle, held, however, that borrower's stipulation waiving usury in the first lawsuit was binding and should be enforced by the court, as should any stipulation properly entered into in resolving litigation. Thus, *Gunn* was based on the fact that the borrower had relinquished its usury defense by stipulation in the first lawsuit.

Similarly in *Munilla*, the court ruled that after a first lawsuit, brought by a lender to enforce an allegedly usurious loan, was settled by written stipulation, the new, non-usurious obligation was not tainted

by the prior usury and, therefore, enforceable. Those cases clearly turned on the parties' stipulations, which resolved prior litigation and were held to be enforceable against the borrower's subsequent claim of usurious taint. There is no stipulation waiving usury or resolving litigation involving an alleged usurious agreement presented here. Moreover, the general legal principles involving usury discussed in *Gunn* undermine, rather than support, L'Arbalete's position. In *Gunn*, the Florida Supreme Court, following long standing precedent, held "that if every element of usury existing in the first agreement is abandoned in a related subsequent agreement, and the borrower voluntarily agrees to fulfill the subsequent agreement, that agreement is enforceable against a claim of usury". *Gunn*, 252 So.2d at 3. However, if the usurious nature of the first agreement is carried forward in the subsequent agreement in any form, the agreement is not purged of usury. *Id.*; *Carter v. Leon Loan & Finance Co.*, 108 Fla. 567, 146 So. 664 (1933). The Zaczacs argue that the usurious nature of the 2003 Transaction carried forward in the Note. Again, for argument's sake only, assuming the 2003 Transaction was usurious, the Court would agree with the Zaczacs. This is because, as the Florida Supreme Court long ago ruled, the illegal taint of an agreement can be purged in two ways, only one which is potentially relevant here. That is, by a reformation of the usurious agreement, expunging the usurious interest by the lender remitting the excess interest and retaining only lawful interest. *Clark v. Grey*, 101 Fla. 1058, 1068, 132 So., 834 832 (Fla. 1931). *See also Rollins v. Odorn*, 519 So.2d 652, 658 (Fla. 1st DCA 1988). L'Arbalete has not returned any allegedly usurious interest to the Zaczacs or to SFH (Del) II and, therefore, would not prevail on its abandonment of the 2003 Transaction argument, if that transaction were usurious.

## CONCLUSION

For the reasons discussed above, Delaware's usury laws, not Florida's, apply to the 2003 transaction. Even if Florida's usury laws *did* apply, the special member interest aspect of the 2003 transaction would not be subject to those laws. Therefore, Defendants Georgi and Lourdes Zaczac have not carried their burden of establishing that the Note is usurious and are liable to Plaintiff L'Arbalete, Inc. for the amount due on the Note. Final judgment will be entered accordingly.

DONE AND ORDERED in Chambers, Miami, Florida, this 1st day of February, 2007.

_____
Paul C. Huck
United States District Judge

Copies furnished to:
Counsel of Record